UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FAIR HOUSING CENTER
OF METROPOLITAN
DETROIT,

       Plaintiff,

   v.

                             Case No. 21-12212

SINGH SENIOR LIVING LLC d/b/a
Waltonwood Management LLC;
WALTONWOOD AT LAKESIDE I, LLC d/b/a
Waltonwood at Lakeside;
WALTONWOOD ROYAL OAK LLC d/b/a
Waltonwood at Royal Oak,

                             Hon. George Caram Steeh

       Defendants.
_____/

OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF NO. 30)

Defendants, Singh Senior Living LLC, Waltonwood at Lakeside I,

LLC, and Waltonwood Royal Oak LLC, seek summary judgment on

Plaintiff's claims of disability discrimination under various federal and state

statutes. For the reasons explained below, Defendants' motion is granted.

BACKGROUND FACTS

Plaintiff Fair Housing Center of Metropolitan Detroit ("Fair Housing

Center") is a nonprofit organization dedicated to ensuring equal access to

housing. Plaintiff investigated several nursing homes and assisted living

facilities in the metropolitan Detroit area to determine whether the facilities offer American Sign Language ("ASL") interpreters for prospective residents who are deaf. These facilities include Waltonwood at Lakeside ("Lakeside") and Waltonwood at Royal Oak ("Royal Oak"). Plaintiff alleges that Defendants violated the Fair Housing Act, Affordable Care Act, Rehabilitation Act, and Michigan Persons with Disabilities Civil Rights Act by refusing to provide ASL interpreters for prospective deaf residents.

To support its mission, the Fair Housing Center conducts training and outreach and investigates housing discrimination complaints. The Center is primarily funded through grants from the U.S. Department of Housing and Urban Development (HUD) and local municipalities. These grants require that the Center investigate complaints, provide outreach and education, and conduct testing to determine compliance with fair housing laws.

In this case, the Fair Housing Center decided to test whether various local senior living facilities would provide an ASL interpreter to prospective deaf residents.[1] As part of this program, the Center sent testers to Waltonwood Royal Oak and Waltonwood Lakeside. Royal Oak offers

---

[1] "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages. In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *E.E.O.C. v. UPS Supply Chain Solutions.*, 620 F.3d 1103, 1105 (9th Cir. 2010).

assisted living and Lakeside offers independent living, assisted living, and memory care. These facilities provide various services to residents, including meals, assistance with bathing and dressing, administering medication, safety checks, and group activities.

A tester visited Waltonwood Royal Oak on June 14, 2019, to inquire about a one-bedroom assisted living apartment for his sister. He met with Danielle Wagner, a marketing manager. The tester told Wagner that his sister was "severely hearing impaired and asked if anyone on the staff was trained in American Sign Language." ECF No. 30-3. Wagner responded that she "didn't know but would ask the nursing supervisor" and get back to the tester. *Id.* "She also encouraged me to return with my sister to meet with her and the nursing supervisor to tour the facility and discuss my sister's specific communication needs in greater detail." *Id.*

The tester followed up with Wagner in a phone call on June 24, 2019. Wagner said that "the nursing supervisor has confirmed that Waltonwood does not have anyone on staff trained in American Sign Language. She said the nursing supervisor suggested that using a communication board would be a good way for the staff to meet my sister's needs. She also said she would call me back in about a week to see if my sister would like to

come to Waltonwood for a tour." *Id.* The tester did not report any further attempts to contact Royal Oak.

A second tester contacted Royal Oak by phone on March 18, 2020, to inquire about a one- or two-bedroom apartment for his cousin. He spoke to Michelle Hansberry, who stated that there were apartments available but that they could not accept new residents due to the coronavirus outbreak. ECF No. 30-5. The tester said that "from what we had seen online they were probably my cousin's favorite, but he is deaf and I wanted to know if they had an American Sign Lang[uage] interpreter on staff." *Id.* Hansberry responded "no, but if he moves in, they will make one available." *Id.*

A third tester called Royal Oak on July 1, 2020, looking for an apartment for her father. The tester told "Michelle" that her father is "deaf from birth, [and] cannot lipread, read or write English," and asked if they "provide ASL services." ECF No. 30-6. Michelle responded that "yes, they do provide ASL." *Id.* The tester then asked, "who pays for the service?" *Id.* Michelle said she would check and get back to the tester.

"Shelley" called the tester back to say that "they cannot pay for an ASL interpreter for my dad, there is no one in the building who knows ASL, [and] she does not know if any of the caregivers know ASL." *Id.* "Shelley

asked me if I called "A Place for Mom." *Id.* When the tester said no, Shelley "said she would get back to me after she investigates further." *Id.*

Shelley called the tester again to report that A Place for Mom "has resources to find an ASL interpreter services, and they access to this information on a database. Once we secure an ASL interpreter, let her know. She would love for dad to move-in there. An ASL interpreter is 'outside our scope,' Shelley said. Shelley also told me there is a place in Beverly Hills, 'Ambrosia Villa.'" *Id.*

A tester conducted a first test of Waltonwood Lakeside on May 24, 2019, and spoke with Jaida McCree about an apartment for his older brother. The tester "told her my brother was deaf and asked if there was someone who was trained in American Sign Language on staff as that was a primary concern." ECF No. 30-7. McCree "said she had some training in high school, but knew of no one that was an ASL interpreter on staff." *Id.* McCree then took the tester on a tour.

A second tester phoned Lakeside on March 27, 2020, to inquire about an apartment for her brother. She said that her brother is deaf and asked if "you have an American Sign Language interpreter available to support him?" ECF No 30-8. "Jodi" responded, "right now we do not." *Id.* The tester asked, "How about any accommodations you can make to

support my brother?" *Id.* Jodi said, "Absolutely, I will be happy to think

outside the box." *Id.* Jodi suggested that the tester and her brother use

FaceTime to go on a virtual tour of the facility. *Id.* Jodi also told the tester

that "she was looking forward to helping my brother and will talk with

marketing manager Laureen Vollmer who will contact me to discuss an

American Sign Language interpreter and/or accommodations for my

brother." *Id.*

Vollmer contacted the tester and told her that "I would love to have

your brother at Waltonwood. I have a resident here that teaches a weekly

sign language class to other residents. This would be perfect for your

brother to communicate with other residents. We will also provide pads of

paper and pens for your brother to communicate with others. Please

contact me and we will arrange a virtual tour." *Id.*

A third tester called Lakeside on July 1, 2020. ECF No. 30-9. The

tester said he was looking for an apartment for his dad, who is "completely

deaf, was born deaf, cannot lipread or write English." *Id.* The tester "asked

if they would provide an ASL interpreter." *Id.* "Laren" said they "do not

provide ASL interpreters," but "further stated several residents 'speak'

ASL." *Id.* She provided information about the amenities of the facility and

asked if the tester's dad needed help taking medication. The tester

responded "no, he is very independent and capable. The only matter is his deafness." *Id.* Laren said she would speak to the executive director and get back to the tester with additional information. *Id.*

In a follow-up call, the tester was told "there is no ASL interpreter on-site, but she will see what they can figure out." *Id.* Laren called the tester back to say that "they have no ASL assistance within the community. No one is available. There are residents who 'sign.' I can hire someone, [but] there is no one in-house." *Id.*

LAW AND ANALYSIS

I.    Standard of Review

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Dist. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In response to a properly supported motion for summary judgment, the opposing party must come forward with specific evidence showing there is a genuine issue of fact for trial. *Anderson*, 477 U.S. at 252.

II.   Standing

Defendants challenge Plaintiff's standing to bring this action. Standing is a jurisdictional requirement: "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction has the burden of demonstrating the three elements of standing: (1) an injury in fact, (2) fairly traceable to the action of the defendant, that (3) is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Each element of standing must be supported with the "manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 561.

- 8 -

An organization may assert standing as the representative of its members or on its own behalf, as the Fair Housing Center does here. *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332-33 (6th Cir. 2002). An organization may establish standing on its own behalf if "it has suffered a palpable injury as a result of the defendants' actions." *Id.* In the context of Fair Housing Act claims, "the circuits generally agree that an organization meets Article III standing requirements where it can show that the defendant's alleged violations of the Fair Housing Act caused it to divert resources from other projects or devote additional resources to a particular project in order to combat the alleged discrimination." *Fair Housing Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 Fed. Appx. 469, 474 (6th Cir. 2006). *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982) (plaintiff organization had standing under FHA when it alleged that racial steering practices impaired its ability to provide counseling and referral services and that it had "to devote significant resources to identify and counteract" those practices). However, the plaintiff must "show some injury that is independent of the costs of litigation." *Id.*; *see also Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993). In *Hooker*, the Sixth Circuit found that a housing organization had standing when it "devoted resources to investigating defendants' practices" by sending a tester. Similarly, in

*Olde St. Andrews*, the court determined that "the resources that the Fair Housing Council directed toward training and employing testers to investigate the Village of Olde St. Andrews constitutes a concrete injury." *Olde St. Andrews*, 210 Fed. Appx. at 478.

Defendants argue that the Fair Housing Center cannot establish that it was injured because it (1) investigated Defendants without prior complaint; and (2) used funds from HUD that required it to conduct testing, so there was no actual diversion of resources. These arguments have been rejected by the Sixth Circuit in similar cases. In *Old St. Andrews*, the court found a diversion of resources, constituting an injury, even though the housing organization received a HUD grant requiring it to conduct testing. *Id.* at 477. The court reasoned that "[i]f the Fair Housing Council had not expended time and money on testing at Olde St. Andrews, it could have used those monies for other testing." *Id.* In addition, the court found that a housing organization could have standing even if it conducted testing on its own initiative, without prior complaint. *Id.* at 478. Defendants have not meaningfully distinguished *Old St. Andrews* or *Hooker*. Moreover, the Sixth Circuit has recently reaffirmed the principle that an organization suffers an injury when it "diverted resources that could have been expended

elsewhere" in response to a defendant's conduct.[2] *See Online Merchants Guild v. Cameron*, 995 F.3d 540, 548 (6th Cir. 2021).

In this case, the Fair Housing Center conducted testing and, after allegedly uncovering discriminatory practices, conducted outreach and education by posting on social media, placing advertisements, and publishing an article to counteract those practices. The Center has demonstrated that it devoted resources to testing for discriminatory practices and counteracting those alleged practices. Under binding Sixth Circuit precedent, the Fair Housing Center has established a sufficiently concrete injury to confer organizational standing.

III.   <u>Applicability of the Rehabilitation Act and Affordable Care Act</u>

The Fair Housing Center alleges that Defendants failed to accommodate the needs of deaf individuals, in violation of the Fair Housing Act ("FHA"), Persons with Disabilities Civil Rights Act ("PWDCRA"), Rehabilitation Act ("RA"), and Affordable Care Act ("ACA"). The RA and

---

[2] Defendants rely upon out-of-circuit cases and *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020) for the proposition that the Center cannot have standing because its expenditures fall within its usual mission to combat housing discrimination. "But *Shelby Advocates* stands for no such thing, because that would contradict the various earlier – and thus controlling – cases to the contrary from this circuit, not to mention Supreme Court precedent, all of which affirm that within-mission organizational expenditures are enough to establish direct organizational standing." *Online Merchants*, 995 F.3d at 548.

ACA apply only to those entities or programs "receiving Federal financial

assistance." *See* 29 U.S.C. § 794(a) (RA); 42 U.S.C. § 18116 (ACA).

"Courts interpreting [section] 504 of the Rehabilitation Act have consistently

construed 'Federal financial assistance' to mean the federal government's

provision of a subsidy to an entity, not the federal government's

compensation of an entity for services provided." *Abdus-Sabur v. Hope

Vill., Inc.*, 221 F. Supp. 3d 3, 9 (D.D.C. 2016). The RA and ACA apply to

the intended recipient of the federal funds, not to a mere beneficiary.

"Congress limited the scope of § 504 [of the Rehabilitation Act] to those

who actually 'receive' federal financial assistance because it sought to

impose § 504 coverage as a form of contractual cost of the recipient's

agreement to accept the federal funds." *U.S. Dep't of Transp. v. Paralyzed

Veterans of Am.*, 477 U.S. 597, 605 (1986). "By limiting coverage to

recipients, Congress imposes the obligations of § 504 upon those who are

in a position to accept or reject those obligations as a part of the decision

whether or not to 'receive' federal funds." *Id.* at 606.

Defendants' Director of Operations, Steven Tyshka, testified that

Defendants do not receive federal financial assistance, including Medicaid

and Medicare, and accepts only private payments for rent. ECF No. 31-4;

ECF No. 32-7 at PageID 796. Plaintiff argues that Defendants accept

- 12 -

federal funds in the form of veterans' benefits. However, Plaintiff provides no evidence to rebut Tyshka's testimony or that Defendants are the recipients of these funds. Veterans' benefits are paid to eligible veterans, who may use them as they choose. Although Defendants may benefit by receiving payments from veterans who are residents, this does not constitute federal financial assistance. *See Paralyzed Veterans*, 477 U.S. at 607. As the Supreme Court explained, "[t]he statute covers those who *receive* the aid, but does not extend as far as those who *benefit* from it. In *Grove City* we recognized that most federal assistance has 'economic ripple effects.' We rejected the argument that those indirect economic benefits can trigger statutory coverage." *Id.* Accordingly, Defendants are not subject to the RA or ACA.[3]

---

[3] Even if the RA and ACA were applicable to Defendants, the failure-to-accommodate analysis is substantially similar to that under the Fair Housing Act and Persons with Disabilities Civil Rights Act. *See Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001) ("Because the Fair Housing Act adopted the concept of a "reasonable accommodation" from § 504 of the Rehabilitation Act, 29 U.S.C. § 791, cases interpreting that term under the Rehabilitation Act also apply to claims under the Fair Housing Act."); *Bachman v. Swan Harbour Ass'n*, 252 Mich. App. 400, 417, 653 N.W.2d 415, 428 (2002) (interpreting PWDCRA parallel provision consistently with FHA); *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 241 (6th Cir. 2019) (the ACA, 42 U.S.C. § 18116, incorporates anti-discrimination provisions of the RA).

IV.    <u>Failure to Accommodate under FHA and PWDCRA</u>

The Fair Housing Act makes it unlawful to discriminate against "any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling," on the basis of that person's handicap. 42 U.S.C. § 3604(f)(2)(A). Discrimination prohibited by the Act includes the refusal to make reasonable accommodations in "rules, policies, practices, or services, when such accommodations may be necessary to afford [the handicapped individual an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).[4] The PWDCRA contains a parallel provision. *See* M.C.L. § 37.1506a(1)(b); *Bachman v. Swan Harbour Ass'n*, 252 Mich. App. 400, 417, 653 N.W.2d 415, 428 (2002).

To establish a reasonable accommodation claim, a plaintiff must show that (1) she is disabled, (2) she requested an accommodation, (3) the defendant housing provider refused to make the accommodation, (4) the accommodation was reasonable and necessary, and (5) the defendant knew or should have known about the disability at the time of the refusal.

---

[4] Defendants argue that the PWDCRA does not apply because Plaintiff did not provide written notice of the need for an accommodation, citing M.C.L. 37.1210(18). But that provision applies to violations "under this article," that is, in the context of employment (Article 2), not housing (Article 5). *Id.; Bachman*, 252 Mich. App. at 429 n.23.

*Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014). "Accommodations required under the Act must be both reasonable and necessary to afford the handicapped individual an equal opportunity to use and enjoy a dwelling." *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1043-44 (6th Cir. 2001). "An accommodation is 'reasonable' when it imposes no 'fundamental alteration in the nature of the program' or 'undue financial and administrative burdens.'" *Howard v. City of Beavercreek*, 276 F.3d 802, 805-06 (6th Cir. 2002) (citation omitted). "In order to prove that an accommodation is 'necessary,' '[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.'" *Id.* (citation omitted). The plaintiff has the burden of demonstrating the reasonableness and necessity of a requested accommodation. *Hollis*, 760 F.3d at 543. "Whether a requested accommodation is required by law is 'highly fact-specific, requiring case-by-case determination.'" *Groner*, 250 F.3d at 1043-44 (citation omitted).

In this case, the Center's testers inquired whether Waltonwood had an ASL interpreter on staff or would provide ASL services for their deaf relatives. The law is clear, however, that providing an ASL interpreter is not the only way to ensure effective communication or to accommodate a deaf

individual. *See* 28 C.F.R. § 36.303 (listing examples of various "auxiliary aids and services").[5] The FHA also does not necessarily require a housing provider to have an ASL interpreter on staff, but to provide one if the circumstances require to ensure a deaf person has an equal opportunity to enjoy the housing of their choice. "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303; *see, e.g., Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 342-43 (11th Cir. 2012) ("[T]he simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights under the RA. Indeed, construing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid.").

---

[5] "Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." 28 C.F.R. § 36.303 (ADA regulation). *See also* 45 C.F.R. § 92.102 (ACA regulation regarding effective communication).

Through its testing, the Center failed to articulate the circumstances under which an ASL interpreter would be necessary. Testers asked whether an interpreter was available or on staff, but did not develop facts indicating the necessity of such an arrangement, for example, by explaining the type of communications or occasions for which an interpreter would be needed. *See, e.g., Southwest Fair Hous. Council v. WG Chandler Villas SH LLC*, 2021 WL 1087200, at *10, *13-14 (D. Ariz. Mar. 22, 2021) (senior apartment complex did not violate FHA or ADA by failing to offer ASL interpreter, when tester indicated that she communicated with her deaf grandfather through written notes and facility did not offer "complex services" that would require an interpreter); *Southwest Fair Hous. Council v. WG Scottsdale LLC*, 2021 WL 857372, at *11 (D. Ariz. Mar. 8, 2021) (question of fact under ADA when facility refused specific requests for ASL interpreter for lease-signing or medical conversations). Given that the necessity of an ASL interpreter is context-dependent, the testers' inquiries failed to provide sufficient information for the court – or a jury – to engage in the "highly fact-specific . . . case-by-case determination" of whether the requested accommodation was required by law. *Groner*, 250 F.3d at 1043-44. *See also Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100,

107 (3d Cir. 2018) ("[T]he Act's necessity element requires that an accommodation be essential, not just preferable.").

The Center suggests that an ASL interpreter is necessary for "certain communications" to ensure that a deaf resident would be able to fully understand "group activities, signing onboarding or financial paperwork, and discussing medical services." ECF No. 32 at PageID 525. However, testers did not request an interpreter for certain, limited occasions, but asked if the facilities had an interpreter on staff or if they would provide one in general free of charge. Testers also did not respond to or reject Waltonwood's suggestions regarding other methods of communication, including a communication board, pen and paper, or the availability of other residents who sign. In this regard, testers were only concerned with whether an ASL interpreter would be provided upon a general inquiry. The necessity of an ASL interpreter – even in the hospital or criminal justice context – is not a given as a matter of law. *See, e.g., Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 835 (11th Cir. 2017) (effective communication "does not mean that deaf patients are entitled to an on-site interpreter every time they ask for it"); *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 870 (9th Cir. 2022) ("We do not apply categorical rules to determine which auxiliary aids are required to achieve effective communication.");

*Updike v. Multnomah Cnty*., 870 F.3d 939, 958 (9th Cir. 2017) (noting that "[a]n ASL interpreter will often be necessary to ensure communication with a deaf person who has become enmeshed in the criminal justice system," but "we do not hold that [plaintiff] necessarily was entitled to have an ASL interpreter as a matter of course").

Plaintiff has not set forth a sufficient factual basis to show that an ASL interpreter was necessary under the testing scenarios. *See Hollis*, 760 F.3d at 543 ("The ultimate burden to prove both reasonableness and necessity . . . lies always with the plaintiff."). A refusal to provide a particular accommodation, without a showing of necessity, does not create liability under the FHA. *See Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1192 (9th Cir. 2021) (rejecting argument that a landlord faces "standalone" liability "when it fails to engage in an interactive process with a disabled tenant" regardless of necessity); *Groner*, 250 F.3d at 1047 ("[W]hile some courts have imposed an obligation on employers and employees to engage in an interactive process, there is no such language in the Fair Housing Act . . . that would impose such a duty on landlords and tenants."); *see also Keys Youth Servs., Inc. v. City of Olathe, KS*, 248 F.3d 1267, 1275 (10th Cir. 2001) (a defendant "cannot be liable for refusing to grant a reasonable

and necessary accommodation if the [defendant] never knew the accommodation was in fact necessary").

Because Plaintiff has not demonstrated an issue of fact regarding the necessity element, Defendants are entitled to summary judgment on Plaintiff's reasonable accommodation claims under the FHA and PWDCRA.

<u>ORDER</u>

Accordingly, IT IS HEREBY ORDERED that Defendants' motion for summary judgment (ECF No. 30) is GRANTED.

Dated: November 28, 2023          s/George Caram Steeh
                                 Hon. George Caram Steeh
                                 United States District Judge

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
November 28, 2023, by electronic and/or ordinary mail.

s/Michael Lang
Deputy Clerk

---